**MISSOURI CHILD CARE ASSOCIATION, d/b/a Missouri Coalition of Children's Agencies, Plaintiff,**

v.

**Dana K. MARTIN, et al., Defendants.**

**No. 01–4045–CV–W–NKL.**

United States District Court,
W.D. Missouri,
Central Division.

Jan. 13, 2003.

Joel E. Anderson, Gary L. Gardner, Attorney General's Office, Douglas G. Leyshock, Mo. Atty. Gene. Jefferson City, MO, Jefferson City, MO, for Dana K. Martin, Denice Cross.

David M. Harris, Valerie G. Lipic, Greensfelder, Hemker & Gale, P.C., St. Louis, MI, for Missouri Child Care Ass'n.

## MEMORANDUM AND ORDER

LAUGHREY, District Judge.

This case was brought by Plaintiff Missouri Child Care Association ("MCCA") under 42 U.S.C. § 1983 ("Section 1983") seeking declaratory and injunctive relief against Defendants Dana K. Martin ("Martin") and Denise Cross ("Cross") (collectively, the "Defendants"), in their official capacities as Directors of the Missouri Department of Social Services ("DSS") and its Division of Family Services ("DFS"). MCCA alleges that the Defendants have failed to comply with certain provisions of the Child Welfare Act, 42 U.S.C. §§ 670, et seq. ("Title IV–E" or "CWA"). Pending before the Court are cross motions for summary judgment filed by the parties [Docs. 73 and 75]. For the reasons discussed below, the Defendants' motion is denied and MCCA's motion for partial summary judgment is granted in part.

## I. Factual Background

### A. The Parties

MCCA is a trade organization for approximately 60 different child care agencies in the State of Missouri. These child care agencies operate approximately 90 residential care facilities. MCCA represents the interests of its members with respect to various matters, including those relating to the administration of foster care programs by DFS. MCCA's member agencies contract with DFS to provide both residential and rehabilitative services to abused and neglected children who are wards of the State. Martin is the Director of DSS which oversees DFS.

### B. The Child Welfare Act

In 1980, Congress enacted the CWA. The CWA establishes a statutory formula, whereby the federal and state governments share the cost of providing aid to foster children. A State becomes eligible to receive federal funds by submitting a State Plan for financial assistance to the Secretary of the Department of Health and Human Services ("DHHS" or the "Secretary"). In order to have its plan approved, the State agrees to administer its foster care program in accordance with the CWA and the implementing regulations and policies of the Secretary.

DSS is the State agency responsible for submitting the Missouri State Plan to the Secretary for his or her approval. The State of Missouri has and continues to participate in the Child Welfare Program and thereby receives federal matching funds to cover part of the costs for foster care services furnished to eligible program beneficiaries.

For a State to receive federal funds under the CWA, it "shall make foster care maintenance payments" for qualified children. 42 U.S.C. 672. The term "foster care maintenance payments" is defined as follows:

[P]ayments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation. In the case of institutional care, "foster care maintenance payments" also includes all reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

42 U.S.C. § 675(4)(A). The Child Welfare Manual further defines the term "reasonable" as used in the definition of "foster

care maintenance payment." "Reasonable" costs are determined in conformance with OMB Circular A–87, which provides in relevant part that costs are "reasonable" if it does not exceed that which would be incurred by a "prudent person." [Child Welfare Manual, Pltf's Exh. 9 at 7; OMB Circular A–87, Pltf's Exh. 10 at 9].

### C. The Provider Agreements

To provide the services mandated by the CWA, DSS through DFS contracts with child-care institutions in the form of a Residential Treatment Contract. The present per diem payment rates are as follows: emergency shelter—$55.18; Moderate Need—$65.89; Severe Need—$83.62; and Intensive Need—$115.88. [See Rehab–RT Contract, Pltf's Exh. 15 and Residential Care Contract, Pltf's Exh. 16]. The per diem rates used in the provider agreements are based on budget considerations. For example, to annually adjust its reimbursement rates paid to child-care institutions for providing foster care maintenance services, DSS multiplies its current budgeted amount for institutional foster care by the percentage increase in its next year's budgeted amount that is appropriated by the legislature and approved by the Governor, and then increases each individual reimbursement rate by an amount equal to that percentage increase.

No analysis is made of the child-care institutions' costs to provide the care that is mandated by the provider contracts; rather, the figures are budget-based. DFS has never attempted an evaluation of the costs associated with providing foster care services by Missouri's child-care institutions. DFS has not undertaken an evaluation of whether the contract rates with the child-care institutions include the reasonable costs for providing the items described as foster care maintenance payments. DFS has never undertaken an evaluation of what costs constitute a rea-

sonable cost for providing foster care services.

MCCA has periodically asked its member organizations to provide it with financial information for costs incurred in providing residential treatment to children placed at member facilities. Information provided by MCCA's members is collected in an annual cost of care report. In requesting such information, MCCA, however, has not provided its member organizations with instructions or information regarding a specific definition of the phrase "foster care maintenance payments" utilized in the CWA. MCCA's own expert, Ken Marx, could not state with reasonable certainty that all costs reported by MCCA's members associated with the provision of residential treatment for children placed in their care were allowable foster care maintenance costs.

### D. The Present Contract Rates

The DFS budget request for fiscal year 2002 provides that the present contract rates do not cover the actual costs incurred by the child-care institutions for residential treatment. This conclusion was reached after a review of the historical feedback from the MCCA, including MCCA's cost of care surveys and discussions with the MCCA that contract rates were anywhere between thirty to fifty percent less than actual costs. DFS based the assessment that the actual costs exceed the contract rates on Generally Accepted Accounting Principals.

DFS has admitted that present contract rates are not comparable with the actual costs of administering and providing the services mandated by its contracts with the child-care institutions. See Fiscal Note Request for Senator Patrick Dougherty, Senate Bill 0473. Senate Bill 0473 sought to remedy this disparity by provid-

ing for an incremental increase in contract rates to child-care institutions to cover the actual cost of providing services to the children committed to the care of the child-care institutions so that by FY 2008, the contract rates would be comparable to the actual costs of care.

Further, the Residential Task Force composed of members of DSS, DFS and "providers" concluded that DFS reimburses only approximately sixty-one percent of child-care institutions' costs of providing services mandated by the Residential Treatment Contract and Rehab–RT Contract for levels II, III and IV. [*See* Joint Report of Providers and DFS for the Residential Task Force ("Joint Report"), Pltf's Exh. 22].

### E. MCCA's Lawsuit

MCCA brought the present lawsuit pursuant to Section 1983, seeking declaratory and injunctive relief against Martin and Cross, in their official capacities as the directors of DSS and DFS. In its Complaint, MCCA seeks a declaration from the Court that the Defendants' cost reimbursement is unlawful because it "violated, continues to violate and/or will violate 42 U.S.C. § 675(4)(A) . . . ." MCCA also alleges that the Defendants will continue to violate Section 675(4)(A). Among other things, it seeks injunctive relief to prevent the Defendants from "continuing to utilize the current payment methodology for determining foster care reimbursement . . . ."

### II. Standard of Review

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party discharges this initial burden, the nonmoving party may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir.1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

### III. Discussion

#### A. Introduction

MCCA and the Defendants have filed cross-motions for summary judgment. The primary thrust of MCCA's motion for summary judgment is that the Defendants are in violation of the CWA for failing to have a methodology in place to ensure that MCCA's member institutions are reimbursed for their reasonable costs of providing foster care maintenance services. MCCA argues that Defendants are necessarily in violation of the CWA because DFS is making reimbursements based on budgetary concerns and not the reasonable cost of providing foster care maintenance.

At this stage of the litigation, MCCA seeks a declaratory judgment that DFS is in violation of the CWA because it lacks a cost based methodology and seeks an order requiring DFS to adopt a methodology based on the factors contained in the CWA (oral argument November 25, 2002) (Plaintiff's suggestions in support of its motion for partial summary judgment (Doc. 76)).

■ Martin and Cross, in their motions for summary judgment (Doc. 73 and 74), argue that MCCA lacks standing to seek redress under Section 1983 because foster care providers have no "federal right" to the maintenance payments at issue. Alternatively, the Defendants argue that even if MCCA and its member institutions do have such a right, the Court can only review whether the rates of reimbursement paid by DSS and DFS cover reasonable and allowable costs of foster care. They assert that the Court cannot review the methodology that Missouri uses to establish its reimbursement rates. Finally, the Defendants argue that MCCA lacks sufficient evidence to demonstrate that DSS and DFS are not reimbursing allowable foster care costs in a reasonable amount.[1] Because the parties' motions for summary judgment require the resolution of overlapping issues, they will be addressed contemporaneously.

### B. MCCA's Standing to Seek Redress Under Section 1983

■ The Supreme Court has clearly stated that "[i]n order to seek redress through § 1983, ... a plaintiff must assert a violation of a federal *right,* not merely a violation of federal *law.*" *Blessing v. Free-*

*stone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (citing *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989)). This principle, while easily stated, is not easily applied. To put the issue in perspective, the Court begins with a brief history of the Supreme Court's jurisprudence in the area.

In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court recognized "for the first time that § 1983 actions may be brought against state actors to enforce rights created by federal statutes as well as by the Constitution." *Gonzaga University v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 2273, 153 L.Ed.2d 309 (2002). The issue in Maine was whether the plaintiffs could recover payments withheld by a state agency in violation of the Social Security Act. *Maine,* 448 U.S. at 4, 100 S.Ct. 2502. One year later, in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Supreme Court "rejected a claim that the Developmentally Disabled Assistance and Bill of Rights Act of 1975 conferred enforceable rights ...." *Gonzaga,* 122 S.Ct. at 2273. The Court in *Pennhurst* reasoned as follows:

In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather an action by the Federal Government to terminate funds to the State.

---

1. The Defendants suggest, in a footnote, that because of an appeal taken by the Defendants from this Court's Order denying their prior motion for judgment on the pleadings, this Court has no jurisdiction at this time to rule on the motions for summary judgment. On June 28, 2002, however, the Eighth Circuit issued its written opinion affirming this Court's prior ruling. *See Missouri Child Care Ass'n v. Cross,* 294 F.3d 1034 (8th Cir.2002). The Defendants' argument regarding this Court's lack of jurisdiction to rule on the presently pending motions is therefore moot.

451 U.S. at 28, 101 S.Ct. 1531. The Supreme Court "made clear that unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." *Gonzaga*, 122 S.Ct. at 2273 (quoting *Pennhurst*, 451 U.S. at 17, 28 and n. 21, 101 S.Ct. 1531).

Following *Pennhurst*, the Supreme Court decided two consecutive cases in which it found spending legislation to create enforceable rights. First, in *Wright v. City of Roanoke Redevelopment and Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the Court "allowed a § 1983 suit by tenants to recover past overcharges under a rent-ceiling provision of the Public Housing Act, on the ground that the provision unambiguously conferred a 'mandatory [benefit] focusing on the individual family and its income.' " *Gonzaga*, 122 S.Ct. at 2273 (quoting *Wright*, 479 U.S. at 430, 107 S.Ct. 766). The key to the inquiry in *Wright* "was that Congress spoke in terms that 'could not be clearer,' and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights under *Pennhurst*.' " *Id.*

(quoting *Wright*, 479 U.S. at 432, 107 S.Ct. 766). The Brooke Amendment, the relevant federal statute in the *Wright* case, provided that a tenant's rent could be no less than, nor more than, 30% of their income. This mandatory limitation focused "on the individual family and its income" and justified a finding that Congress intended such individuals to be able to seek relief in federal court under § 1983 if they were charged differently.

Next, in *Wilder v. Virginia Hospital Ass'n*, 496 ¡U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court "allowed a § 1983 suit brought by health care providers to enforce a reimbursement provision of the Medicaid Act,[2] on the ground that the provision, much like the rent-ceiling provision in *Wright*, explicitly conferred specific monetary entitlements upon the plaintiffs." *Gonzaga*, 122 S.Ct. at 2274. The decision in *Wilder* was based upon the Court's determination that "Congress left no doubt of its intent for private enforcement ... because the provision required States to pay an 'objective' monetary entitlement to individual health care providers, ...." *Id.* (citing *Wilder*, 496 U.S. at 522–23, 110 S.Ct. 2510). The stat-

**2.** Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to states, to enable states to furnish medical care to qualifying individuals. The federal and state governments share the cost of such aid. 42 U.S.C. § 1396. State participation in the Medicaid program is voluntary, but participating states must comply with certain requirements imposed by the Medicaid Act and with certain regulations promulgated by the Secretary of Health and Human Services. *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455, (1990). Participating states are required to submit to and have approved by the Secretary a "plan for medical assistance," which must contain a comprehensive statement describing the nature and scope of the State's Medicaid program. 42 C.F.R. § 430.10 (1989). The State Plan must establish a scheme for reimbursing

health care providers for medical services provided to needy individuals. *Wilder*, 496 U.S. at 502, 110 S.Ct. 2510. Section 1902(a)(13) of the Medicaid Act establishes the requirements for States' Medicaid reimbursement plans for health care providers. As modified in 1980 by an amendment known as the Boren Amendment, the section provides that a State Plan for medical assistance must provide for payment of the services provided under the plan "through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards...." 42 U.S.C. § 1396a(a)(13)(A).

ute at issue in *Wilder* required the State to "provide ... for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded ... through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws ...." 42 U.S.C. 1396a(a)(B)(A) (1982 ed., Supp V) (also referred to as the Boren Amendment).

In its three most recent opinions on private actions to enforce spending legislation, the Supreme Court has held, once unanimously and twice by 7–2 votes, that the statutes in question did not confer enforceable rights on the private plaintiffs. In *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), the Court found no basis for a Section 1983 suit brought to enforce provisions of the Adoption Assistance and Child Welfare Act of 1980 which "required States receiving funds for adoption assistance to have a 'plan' to make 'reasonable efforts' to keep children out of foster homes." *Gonzaga*, 122 S.Ct. at 2274. The court in *Suter* determined that:

> Careful examination of the language ... does not unambiguously confer an enforceable right upon the Act's beneficiaries. The term "reasonable efforts" in this context is at least plausibly read to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary in the manner of [reducing or eliminating payments].

503 U.S. at 363, 112 S.Ct. 1360.

In *Blessing*, the Supreme Court held that a provision in Title IV–D of the Social Security Act which required States receiving federal child-welfare funds to "operate its child support program in 'substantial compliance' with Title IV–D was not intended to benefit individual children and custodial parents, and therefore [did] not constitute a federal right." 520 U.S. at 343, 117 S.Ct. 1353. Instead, the Court found that "[f]ar from creating an *individual* entitlement to services, the standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV–D program." *Id.*

Finally, in its most recent relevant opinion, *Gonzaga*, a case decided after the parties submitted their briefs in this case, the Supreme Court held that an action under Section 1983 to enforce certain privacy provisions of the Family Educational Rights and Privacy Act of 1974 ("FERPA") was foreclosed because the relevant FERPA provisions created no personal rights which were enforceable under Section 1983. *See* 122 S.Ct. at 2271. In reaching its decision, the Supreme Court discussed its decision in *Blessing*, noting that language in that case may have been read to "suggest that something less than an unambiguously conferred right is enforceable by § 1983." *Id.* at 2275. Specifically, the Court pointed to *Blessing's* use of three "'factors' to guide judicial inquiry into whether or not a statute confers a right." Those factors were:

> 'Congress must have intended that the provision in question benefit the plaintiff,' 'the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial resources,' and 'the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.'

*Id.* (quoting *Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353).

The Court in *Gonzaga* noted that *Blessing* had been interpreted by some courts "as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action." *Id.* The Supreme Court then expressly stated that it "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action under § 1983." *Id.* "[I]t is *rights,* not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id.* (emphasis in original).

■ Turning to the instant case, the Defendants argue that MCCA has no enforceable federal right in this case because Congress did not intend for the foster care maintenance statute or the maintenance payments themselves to benefit the MCCA, its member institutions, or foster care providers in general. [*See* Dfts' Sugg. in Supp. of Mot. at 6]. They suggest that the payments were instead intended only to benefit foster children.

Relying largely on *Wilder,* MCCA argues that the CWA's reimbursement provisions are in fact intended to benefit foster care institutions and it has standing to pursue its claims. The Court agrees. The Court's conclusion is based on *Wilder, Minnesota HomeCare Ass'n v. Gomez,* 108 F.3d 917 (8th Cir.1997), and *Arkansas Medical Soc'y, Inc. v. Reynolds,* 6 F.3d 519, 531 (8th Cir.1993).

The Court finds that there is no fair basis for distinguishing *Wilder.*[3] In that case, the Supreme Court gave VA hospitals the right to sue in federal court under § 1983 to obtain reimbursement for the cost of providing medical services to indigents as mandated by the Medicaid Act. "The right is not merely a procedural one that rates be accompanied by findings and assurances (however perfunctory) of reasonableness and adequacy; rather the Act provides a substantive right to reasonable and adequate rates as well." *Wilder,* 496 U.S. at 510, 110 S.Ct. 2510. Even the dissent in *Wilder* acknowledged that:

> Under the logic of our case law, [the VA Hospital Association] arguably may bring a § 1983 action to require that rates be set according to that process. Indeed, establishment of rates in accordance with that process is the only discernible right accruing to anyone under [the Medicaid Act].

*Id.* at 527–28, 110 S.Ct. 2510. At this stage of the litigation, MCCA seeks only an order requiring the Defendants to determine a reimbursement rate that is based on the statutory criteria in the CWA. Even the dissent in *Wilder* seemed to acknowledge such a right.

In *Gonzaga,* the U.S. Supreme Court did not overrule *Wilder.* Without criticism, it stated that in *Wilder* it had found standing to sue under § 1983 "to enforce a reimbursement provision of the Medicaid Act, on the ground that the provision, ... in *Wilder,* explicitly conferred specific monetary entitlements upon the plaintiffs." *Gonzaga,* 122 S.Ct. at 2274. The Supreme Court in *Gonzaga* then pointed out that in *Suter* and *Blessing* the Court had refused to infer enforceable rights under the spending clause, but may have put a mis-

---

**3.** While that case dealt with the Medicaid Act (specifically, the Boren Amendment), and not the CWA, the two statutes are analagous.

leading emphasis on benefits instead of focusing on Congress' intent to permit individual suits to enforce spending legislation. If the Supreme Court had intended to overrule *Wilder*, one would expect the criticisms or clarification to be directed at *Wilder* and not *Blessing* and *Suter*.

The CWA, like the Medicaid statute in *Wilder*, explicitly confers monetary entitlements on the foster care institutional providers and evidences Congress' intent to permit those foster care institutions to enforce their rights in federal court using § 1983. While the ultimate beneficiaries of the Medicaid statute were the indigents who received medical services, the Supreme Court in *Wilder* found that the hospitals had a right to be paid according to the terms of the statute and could use § 1983 to enforce that right. Similarly, while the ultimate beneficiaries of the CWA are the foster children, Congress mandated that foster care providers should recover their costs, thereby creating a similar right of enforcement recognized in *Wilder*. Furthermore, in both the CWA and the Medicaid statute, the reference to costs focuses on the institutions and not the children. Congress must have recognized that if costs were not covered, reputable foster care service would eventually not be available. Congress would also have been aware that as a general proposition foster care institutions, not foster children, would be in a better position to enforce those rights, thereby ensuring the continued implementation of congressional intent.

Finally, Congress provided sufficient guidance in the CWA to permit judicial enforcement.[4] The foster care payments must cover "the cost of ... food, clothing, shelter, daily supervision, school supplies,

a child's personal incidentals, liability insurance with respect to a child and reasonable travel to the child's home for visitation. In the case of institutional care, 'foster care maintenance payments' also includes all reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence." 42 U.S.C. § 675(4)(A). Payments, therefore, are based either on itemized costs or reasonable overhead, issues routinely entrusted to the judiciary in both statutory and common law actions. The Boren Amendment at issue in *Wilder* used the term "reasonable access" without defining the term, yet the court found that the Boren Amendment was sufficiently defined to permit judicial enforcement. *Wilder*, 496 U.S. at 501, 110 S.Ct. 2510. It also found that courts were capable of interpreting and enforcing a reimbursement rate based on the "costs which must be incurred by efficiently and economically operated facilities". *Wilder*, 496 U.S. at 524. *Also see Arkansas Medical Soc'y v. Reynolds*, 6 F.3d 519, 527 (8th Cir.1993). Even before the Boren Amendment, the Eighth Circuit had recognized that providers had standing to sue under the Medicaid Act, at a time when the statute was even less specific. *Nebraska Health Care Ass'n v. Dunning*, 778 F.2d 1291, 1295 (8th Cir.1985).

The Court's finding that foster care providers have a right to enforce the payment provision of the CWA is buttressed by *Minnesota HomeCare Ass'n v. Gomez*, 108 F.3d 917 (8th Cir.1997). The issue in that case was whether Minnesota had in place a methodology for setting rates that complied with the equal access provision of the Medicaid Act. While the Eighth Circuit did

---

**4.** While the *Golden State/Blessing* test is no longer applicable, this factor is relevant in

deciding what Congress intended.

not address standing, it did address the merits. Because standing is a jurisdictional issue which must be raised *sua sponte,* it is assumed that the Eighth Circuit was of the opinion that the Minnesota Home-Care Association had standing to raise its claim. Judge Loken, in a concurring opinion did conclude that the HomeCare Association had failed to state a claim because "[t]heir asserted right is 'merely a procedural one,' and the procedural interest they assert is 'so vague and amorphous' as to be 'beyond the competence of the judiciary to enforce'." *Minnesota HomeCare Ass'n v. Gomez* at 919 (quoting *Wilder,* 496 U.S. at 509–10, 110 S.Ct. 2510). However, no mention was made about standing, probably because the issue had previously been address in *Arkansas Medical Soc'y, Inc. v. Reynolds,* 6 F.3d 519 (1993).

In *Arkansas Medical Soc'y v. Reynolds,* 6 F.3d 519 (1993), the Eighth Circuit held that *Wilder* had effectively resolved the question of whether Congress intended to confer standing on individuals to sue under § 1983 to enforce the equal access provision of the Medicaid Act. It concluded that the Boren and equal access clauses of the Medicaid Act were analogous and the latter was intended by Congress to permit providers to sue individually for enforcement under 1983. As in *Wilder,* there was mandatory language requiring the states to provide reimbursement as dictated by the federal statute. As in *Wilder,* the focus was on reimbursement to providers for described service. As in *Wilder,* the statutory right was sufficiently defined to be judicially enforceable.

Given the reasoning in *Wilder* and *Arkansas Medical Soc'y,* the Court concludes that Congress intended there to be a private right of action under §§ 672 and 675 of the CWA. Furthermore, there is not a process under the CWA where an aggrieved individual has access to any feder-al review mechanism. *See Gonzaga,* 122 S.Ct. at 2279 ("These administrative procedures squarely distinguish this case from *Wright* and *Wilder,* where an aggrieved individual lacked any federal review mechanism").

Having addressed the standing issue, the Court turns to the question of whether the Court can review the Defendants' methodology for determining foster care maintenance payments.

## C. Methodology Versus Substantive Compliance

■ MCCA argues that the Child Welfare Act mandates that a participating State have a methodology in place to determine foster care maintenance payments and that methodology must be based on the statutory factors in the CWA. MCCA invokes specific provisions of the Child Welfare Act to support its argument. First, sections 672(a) and (b)(2) require a State to make "foster care maintenance payments" and those payments can only be to either a "foster family home" or "child care institution." 42 U.S.C. §§ 672(a) and (b)(2). Next, Section 675(4)(A) defines "foster care maintenance payments" as payments to cover the cost of, and the cost of providing, certain items such as food, clothing, shelter, and daily supervision. In the case of institutional care, foster care maintenance payments "shall include the reasonable costs of administration and operation of such institution as necessarily required to provide" for the allowed costs. 42 U.S.C. § 675(4)(A). In addition, the Child Welfare Act requires the Defendants to have a State Plan that provides for foster care maintenance payments. 42 U.S.C. § 671(a). Finally, the Defendants must give an assurance that the State Plan meets all of the Child Welfare Act requirements, which includes the requirement to pay providers for their reasonable costs of

providing Child Welfare Act services. 42 U.S.C. § 671(a)(11).

To support its contention, MCCA again looks to *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The ultimate conclusion in *Wilder* was that the Boren Amendment required participating States to "adopt rates that it finds are reasonable and adequate rates to meet the costs of an efficient and economical health care provider." *Wilder* 496 U.S. at 524. MCCA asserts that the language of the Boren Amendment is very similar to the language at issue in the Child Welfare Act. The Plaintiff also relies on *Oklahoma Nursing Home Ass'n v. Demps,* 792 F.Supp. 721 (W.D.Okla.1992) (holding that the plaintiffs could state a cause of action that the State violated the reasonable and adequate requirement of the Boren Amendment by basing its reimbursement rates solely on budget considerations. The State had argued that the claim should be dismissed because there was no procedural requirement to have a methodology), and *Orthopaedic Hosp. v. Belshe,* 103 F.3d 1491, 1499 (9th Cir.1997) (determining that the Medicaid Act, specifically 42 U.S.C. § 1396a(a)(30)(A) known as the equal access provision, requires the State to set reimbursement rates for out-patient services that bear reasonable relationship to efficient hospitals' costs and, to do this, the agency must look at the costs. Otherwise, the State has not considered whether it is setting reasonable rates).

In contrast, the Defendants argue that the Child Welfare Act does not require a State to use a particular or certain methodology and relies on *Minnesota Home-Care Ass'n v. Gomez,* 108 F.3d 917 (1997), to support its argument that it is in compliance with the CWA. In *Minnesota HomeCare,* as previously noted, home health care providers sued the Minnesota Department of Human Services on the theory that the State's rate-setting methodology violated the Medicaid Act, specifically 42 U.S.C. § 1396a(a)(30)(A), the equal access provision. On appeal, the Eighth Circuit held that the State's methodology for establishing and maintaining home health care rates under its Medicaid program satisfied the statutory requirement that the rates be established with due consideration of equal access factors. Defendants rely on the following quote to support their argument that no methodology therefore is required. "The Medicaid Act mandates consideration of the equal access factors of efficiency, economy, quality of care and access to services in the process of setting or changing payment rates; however, it does not require the State to utilize any prescribed method of analyzing and considering said factors." *Id.* at 918.[5]

This quoted language, relied on by Defendants, does not support their conclusion that a State is not required to have a methodology for setting rates that considers the CWA requirements. In fact, the quoted language says that a State must consider certain factors and implies that a methodology that does not consider these factors is invalid. The quote states that the statute does not require a certain, particular, or "prescribed" method of analyzing the factors. This supports the Defendants' argument that no particular methodology is required but also supports MCCA's argument that some methodology must be used that considers the statutory

---

**5.** In the next paragraph, the Eighth Circuit went on to find that while the State did not present to the legislature information based on the statutory criteria, other groups did, including the Minnesota HomeCare Association, and therefore those facts were before the legislature at the time the rates were set by the legislature. The court then went on to find that the State's methodology met the requirements of the statute.

criteria. MCCA is not arguing for a particular methodology, just one that considers the costs of care providers.

Additionally, if the Eighth Circuit held in *Minnesota HomeCare* that there was no right to a rate setting methodology, it is inconsistent with the court's action in the case. The court reviewed the methodology used by Minnesota but found that the State had complied with the Medicaid Act because the required factors had been taken into consideration when the reimbursement rate was determined. *Id.* at 917–18. Thus, the court acknowledged by implication the existence of a right to have the State adopt a reimbursement methodology in accordance with federal law.

Finally, the majority opinion is given perspective by Judge Loken's concurring opinion. In it, he concludes that there is no right to a "methodology" which is what was requested by the Minnesota Home-Care Association. Having made that distinction, he concurs with the result of the majority opinion. If the majority had concluded that there was no right to a methodology that considers statutory criteria, concurrence would have been unnecessary.

Even the dissent in *Wilder* acknowledged that:

Under the logic of our case law, [the VA Hospital Association] arguably may bring a § 1983 action to require that rates be set according to that process. Indeed, establishment of rates in accordance with that process is the only discernible right accruing to anyone under [the Medicaid Act].

*Id.* at 527–28. At this stage of the litigation, MCCA is only asking the State to use the required criteria for determining reimbursement rates.

The Defendants next argue that the Child Welfare Act, unlike the Medicaid Act, does not set out any cost factors for consideration. Defendants argue that the statute merely defines "foster care maintenance payments." They contend that the factors contained in that definition are not mandated and need not be considered by the State. The Court disagrees. The definition of foster care maintenance payment is incorporated into 42 U.S.C. § 672 of the Child Welfare Act and that provision is mandatory.[6] Hence, like the Boren Amendment, the Child Welfare Act definition gives factors to be considered. The payments must cover 1) the cost of certain items, 2) the cost of providing certain items, and 3) the reasonable costs of administration for institutional providers. While the list of factors is somewhat less detailed than the Boren Amendment factors, they are sufficiently detailed to put the State on notice and to permit a court to review whether the State has based its reimbursement on those statutory criteria.

The Defendants also contend that the Court cannot review the methodology Missouri uses to establish its reimbursement rates because they are effectively set by the Missouri Legislature. *Minnesota HomeCare*, 108 F.3d at 919 (Loken, C.J.concurring). Further, Defendants assert that it would be futile to review the

---

**6.** "Each state with a plan ... shall make foster care maintenance payments" for qualified children. 42 U.S.C. § 672. The term "foster care maintenance payment" is defined as follows:

[P]ayments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation. In the case of institutional care, "foster care maintenance payments" also includes all reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

methodology by which the Defendants gather and transfer information to the legislature, which the legislature may then ignore when adopting statutory rates. *Id.* Yet, this argument does not address the issue of whether the Court can review whether the State has a method for establishing reimbursement rates that complies with the statute. At this stage of the litigation, it is unclear to the Court whether MCCA will ever obtain meaningful relief, but that is an issue for another day. At a minimum, the State is obligated to have a process for determining rates that takes into account the statutory criteria mandated by the CWA. *See Arkansas Medical Soc'y, Inc. v. Reynolds,* 6 F.3d 519, 531 (8th Cir.1993); *see also, Oklahoma Nursing Home Ass'n v. Demps,* 792 F.Supp. 721, 724 (W.D.Okla.1992); *Friedman v. Perales,* 668 F.Supp. 216 (S.D.N.Y. 1987); *Hillhaven Corp. v. Wisconsin Dep't of Health and Soc. Serv.,* 634 F.Supp. 1313 (E.D.Wis.1986); *Thomas v. Johnston,* 557 F.Supp. 879 (W.D.Tex.1983). Furthermore, the Court is unclear whether the legislature sets the appropriation and DFS then sets the rate based on that appropriation, or there is a State statute that independently sets the reimbursement rate for foster care providers.

### D. Does Missouri Determine the Rate Based on Only State Budget Concerns?

MCCA argues that Missouri bases its rate of reimbursement to child-care institutions based solely on available appropriations, giving no consideration to the factors mandated by the federal statute. The Defendants describe the method as follows: "To annually adjust its reimbursement rates paid to child-care institutions for providing foster care maintenance services, the Division of Family Services of the State of Missouri Department of Social Services multiplies its current budgeted amount for institutional foster care by the percentage increase in its next year's budgeted amount that is appropriated by the legislature and approved by the governor, and then increases each individual reimbursement rate by an amount equal to that percentage increase." (Def. Motion for Summary Judgment, p. 1, ¶ 1).

The Deputy Director of Department of Family Services, Sheila Tannehill ("Tannehill"), testified at various points during her deposition that the rate of reimbursement to the child-care institutions is based solely on available appropriations. Her testimony was as follows:

Q: How does the State set the rates for the respective levels of service that are provided by the residential facilities?

A: The rates are based on available appropriations designated specifically for residential treatment.

Q: When you say "available appropriations," do you mean the amount that's been budgeted for the residential treatment as a line item in the Department's budget?

A: Right. There is a specific line item appropriation for residential treatment.

(S. Tannehill Dep. p. 11, ln. 11–20).

Later in the deposition, Tannehill further reinforced the fact that no methodology for calculating foster care maintenance payments exists by stating:

Q: The payment rates that are provided in the provider contracts with the residential homes -

A. Yes.

Q: —those are derived from the budget figures that we looked at in the Form V; you derived a rate per level of care and then those go into the contracts?

A: That is correct.

(S. Tannehill Dep. p. 85, ln. 19–25). Tannehill's testimony is supported by the fact

that Defendants produced no present methodology for calculating foster care maintenance payments in response to Plaintiff's Request for Production specifically seeking such documentation. Furthermore, Tannehill readily admitted that DFS has no basis for ensuring that the present rates of reimbursement are reasonable because it has never made any study of the cost of providing care to foster children in child-care institutions. Specifically, Tannehill testified:

Q: And so would it be fair for me to conclude that there is no—there is no analysis of a particular provider's cost of providing care that goes into the rate that is in the contract?

A: That is correct.

. . . . .

Q: How do you know if the rates are reasonable? Or do you know if the rates are reasonable as provided in provider agreements to foster care homes?

A: ... As far as reasonable, I don't know whether they are reasonable or not.

(S. Tannehill Dep. p. 86, ln.9–8 and 18–25). Again, this testimony is supported by the fact that Defendants failed to produce any studies or findings pertaining to the costs of providing the services defined as foster care maintenance in their discovery responses.

 There is no factual dispute on this issue. Missouri bases its reimbursement rates on budget considerations, not the factors mandated by the CWA.[7]

### E. Does Missouri's Budget–Based Methodology Comply With the CWA

Next, MCCA argues that the Eighth Circuit has invalidated reimbursement methodologies which are based on budget factors to the exclusion of requirements mandated by the enabling legislation. *Arkansas Medical Soc., Inc. v. Reynolds*, 6 F.3d 519, 531 (8th Cir.1993) (the State cannot simply ignore Medicaid's requirements in order to suit budgetary needs). Budget considerations cannot be the conclusive factor in decisions regarding Medicaid; however, the State may take into consideration budget considerations when setting its reimbursement methodology. *See Oklahoma Nursing Home Ass'n*, 792 F.Supp. at 724 (denying a motion to dismiss because a State does violate the Boren Amendment if the State's sole concern in setting Medicaid rates is the State's fiscal budget); *Friedman v. Perales*, 668 F.Supp. 216 (S.D.N.Y.1987) (same); *Hillhaven Corp. v. Wisconsin Dep't of Health and Soc. Serv.*, 634 F.Supp. 1313 (E.D.Wis. 1986) (same).

This Court is not holding that the Defendants need a certain or particular methodology, just that the Defendants need a methodology that considers the required factors. The Court declines at this juncture to determine if Missouri's reimbursement actually covers the cost of the allowable items or any other issue raised by the parties' motions for summary judgment because there are factual issues in dispute on all remaining claims.

### IV. Conclusion

Accordingly, it is hereby

ORDERED that Defendant's Motion for Summary Judgment [Doc. 73] is DENIED and Plaintiff's Motion for Partial Summary Judgment is GRANTED in part. The Court finds that Defendants have violated

---

7. While it is true that Missouri need only be in substantial compliance with the CWA, a failure to even consider the relevant statutory factors cannot be substantial compliance.

the CWA by failing to adopt a methodology for determining foster care payments that is based on the statutory factors contained in 42 U.S.C. §§ 672/675(4)(A). Defendants are ordered, within 60 days, to present to the Court a methodology for determining foster care maintenance payments that is based on the statutory criteria contained in 42 U.S.C. §§ 672/675(4)(A). In all other respects, Plaintiff's Motion for Partial Summary Judgment (Doc. 75) is DENIED.