OPinion by Judge RYMER; Concurrence by Judge WU.
RYMER, Circuit Judge:
California Alliance of Child and Family Services, an association of private, nonprofit agencies that provide adoption, foster care, and group home services, appeals the summary judgment entered in favor of Cliff Allenby, the interim director of the California Department of Social Services (the State). We must determine whether the State is in compliance with the federal Child Welfare Act’s (CWA) mandate that a participating state “cover the cost” of certain enumerated items for foster care group homes when it pays at a rate that is approximately 80 percent of actual 1986-1987 costs adjusted for inflation. The district court concluded that this substantially complies with the CWA. We disagree; the natural meaning of “cover the cost” is to pay in full, not in part. As the State isn’t doing this, we reverse.
I
The CWA, codified at 42 U.S.C. §§ 670-679b, was enacted in 1980 and creates an opt-in scheme whereby states can receive federal funding to assist in the costs associated with raising children who are depen-dants or wards of the state. To qualify for federal funding, the state agrees to abide by certain requirements.
The state must first submit a plan to the Secretary of the United States Department of Health and Human Services (DHHS). See 42 U.S.C. § 671(a). Among other things, the plan must “provide[ ] for foster care maintenance payments in accordance with” other provisions of the CWA. 42 U.S.C. § 671(a)(1). The state must also designate a state agency to administer the plan once approved, and must agree to amend its plan to comply with any changes made to the CWA or other applicable federal law. 42 U.S.C. § 671(a)(2); 45 C.F.R. § 1356.20(d)(1).
The CWA further provides that any state with an approved plan “shall make foster care maintenance payments on behalf of each” qualifying child. 42 U.S.C. § 672(a)(1). The phrase “foster care maintenance payments” is defined as
payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child’s personal incidentals, liability insurance with respect to a child, reasonable travel to the child’s home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.
42 U.S.C. § 675(4)(A).
California has created its own statutory scheme in an attempt to comply with the CWA.[1] It has designated the California Department of Social Services (CDSS) as the agency responsible for administering *1019 California’s CWA plan. See Cal. Welf. & Inst.Code §§ 11229, 11460(a). The plan calls for CDSS to pay foster care providers on “a per child per month rate in return for the care and supervision of the [ ] child placed with them.” Cal. Welf. & Inst.Code § 11460(a). “Care and supervision” is defined in such a way that it substantially mirrors the federal definition of foster care maintenance payments. It covers “food, clothing, shelter, daily supervision, school supplies, a child’s personal incidentals, liability insurance with respect to a child, and reasonable travel to the child’s home for visitation.” Cal. Welf. & Inst.Code § 11460(b).
California uses the Rate Classification Level system (RCL) to determine the amount of the foster care maintenance payments it makes. See Cal. Welf. & Inst. Code § 11462. The RCL uses a point system that classifies group homes in fourteen categories — the funding they receive depends on the category. See Cal. Welf. & Inst.Code § 11462(b), (d)-(f). A group home’s RCL is based on “the level of care and services that the group home operator projects will be provided during the period of time for which the rate is being established,” Cal. Welf. & Inst.Code § 11462(e), and payments are made on a per child, per month basis, Cal. Welf. & Inst.Code § 11460(a). The rates were initially made effective on July 1, 1990, relying on data from a study of 1985 calendar year costs and since then reflect adjustments made, starting with the 1986-1987 fiscal year, based on the California Necessities Index (CNI). See Cal. Welf. & Inst.Code § 11462(c). The CNI is a weighted average of changes in various costs of living for low-income consumers, including food, clothing, fuel, utilities, rent and transportation. See, e.g., Cal. Welf. & Inst.Code § 11453(a). Thus, these annual adjustments reflect any increase or decrease in the cost of living, as measured by one constant calculation of inflation- — -the CNI. See id. Beginning with the 2000-2001 fiscal year, the California statute has provided that “the standardized schedule of rates[for group homes] shall be adjusted annually by an amount equal to the CNI computed pursuant to Section 11453, subject to the availability of funds. The resultant amounts shall constitute the new standardized schedule of rates.” Cal. Welf. & Inst.Code § 11462(g)(2).[2]
II
The Alliance accepts the State’s system for calculating costs to be covered, but takes issue with the State’s underfunding of foster care maintenance payments as a result of having failed to adjust the standardized schedule of rates by an amount equal to the CNI since 2001. Accordingly, it brought this action, asserting that the State is violating CWA’s mandate to cover costs, and seeking declaratory and injunc-tive relief under 42 U.S.C. § 1983.
After discovery, the parties filed cross motions for summary judgment. In a joint statement of undisputed facts they agreed that since the inception of the RCL, the payment schedule has increased by approximately 27 percent; that since the 1990-1991 fiscal year, the actual costs incurred by group homes for the care and supervision of children has increased by more than 27 percent; and that the CNI has increased by approximately 59 percent since the 1990-1991 fiscal year. The State *1020 admits that as of 2005-2006, it was making foster care maintenance payments at an amount approximately 80 percent[3] of what they would have been had it made yearly CNI adjustments.
The district court granted summary judgment in favor of the State. The court concluded that the State based its initial reimbursement standard on the statutory criteria mandated by the federal statute. Although the court recognized that the standard rate schedule could become so out of sync with the cost of items listed in the CWA that the California system would be in violation of federal law, it concluded that the process for determining foster care payment rates remains substantially compliant given that today, the RCL provides for about 80 percent of the costs associated with those items. Finally, the court held that the CWA does not prohibit the State from taking budgetary considerations into account.[4]
Ill
“We review the district court’s decision to grant summary judgment de novo. Thus, viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.” Fichman v. Media Center, 512 F.3d 1157, 1159 (9th Cir.2008) (internal citation omitted); see also Fed.R.Civ.P. 56(c). We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1331.[5]
IV
The threshold question in this case is what the CWA actually mandates the State to do. Section 672(a)(1) provides that the State “shall make foster care maintenance payments on behalf of each” qualifying child — that is, “payments to cover the cost of (and the cost of providing)” various daily living expenses, 42 U.S.C. § 675(4)(A). We therefore must answer two questions: (1) What does it mean to “cover” costs? and (2) how are “costs” defined? We address each question in turn.
*1021 In determining what it means to “cover” costs, we look to the relevant statute for context. “In interpreting a statute, we first look to the plain meaning of its text.” See Paul Revere Insurance Group v. United States, 500 F.3d 957, 962 (9th Cir.2007). Absent a definition in the statute itself, in attempting to divine the meaning of a particular word we generally use the “ordinary, contemporary, common meaning.” Wilderness Society v. U.S. Fish & Wildlife Service, 353 F.3d 1051, 1060 (9th Cir.2003) (en banc) (internal quotation marks omitted); see United States v. Smith, 155 F.3d 1051, 1057 (9th Cir.1998). Here, the term “cover” and the phrase “cover the costs” are both left undefined by the CWA. In these circumstances, consulting common dictionary definitions is the usual course. See Wilderness Society, 353 F.3d at 1061.
Various dictionaries indicate that to “cover” in the context of costs means an amount sufficient to pay all the costs. See, e.g., Concise Oxford English Dictionary 330 (Catherine Soanes & Angus Stevenson, eds., 11th ed., Oxford Univ. Press 2004) (“(of money) be enough to pay (a cost): there are grants to cover the cost of materials for loft insulation”); Webster’s Third New International Dictionary 524 (Merriam-Webster 2002) (“to be adequate to defray or compensate”). This comports with the common understanding of what it means to “cover the cost.” For example, we normally understand an obligation to maintain sufficient funds in a bank account to cover checks as requiring us to provide enough money in reserve to offset the amount of the check. Eighty percent of the amount won’t do. On the other hand, it is easy to imagine an alternate scenario where “cover” is qualified. For example, parents might tell their child they will help cover the cost of college. In such a scenario, the common understanding would be that the parents will cover some, but not all, of their child’s college-related expenses. But here, because the CWA leaves “cover” unqualified, the common understanding is that it must refer to meeting all the costs of food, clothing, shelter, etc. See 42 U.S.C. § 675(4)(A).
The question then becomes one of measuring the cost of those covered items. While the CWA identifies the types of items that must be covered, it does not prescribe any particular metric to measure the cost of those items. Each state develops its own plan. California uses the RCL system to make this determination. At the time it implemented its CWA plan, the State looked to 1985 calendar year costs from a pilot study for the various items, see Cal. Welf. & InstCode § 11462(c), and created separate levels for different group homes based on the “care and services that the group home operator projects will be provided during the period of time for which the rate is being established,” Cal. Welf. & InstCode § 11462(e). The California statute moreover provides for yearly adjustments in the proper RCL calculation, tied to the CNI — in other words, it makes sure if the cost of certain items rise or fall, the RCL takes that change in cost into account. See Cal. Welf. & InstCode §§ 11453(a), 11462(c). Thus, California decided that the original RCL, as adjusted by the CNI each year, is the cost of the basket of items the CWA requires to be covered. It is undisputed that the State is no longer paying this amount — rather, it is paying somewhere in the neighborhood of 80 percent of the amount. In other words, the CWA requires California to cover the cost of certain items and California has developed a formula to determine what those items cost, but is now only partially covering the cost of those items. This runs afoul of the CWA’s mandate.
*1022 The State’s arguments to the contrary are not persuasive. It points out that the provision for a CNI adjustment in its CWA plan is subject to availability of funds. However, the State disavows relying on this “out” in this case; its brief represents that “California is not using ‘lack of funds’ as an ‘excuse’ to avoid complying with the Act.” In any event, the State developed no record to support the possibility that it skipped a yearly CNI adjustment for lack of funds. Consequently, we decline both parties’ invitation to express an opinion on whether availability of funds is a proper limitation under the CWA on the obligation to cover costs.
The State emphasizes that the CWA does not mandate covering “actual” costs, which is true. However, this is a straw-man as the Alliance does not contend that the State must cover every dime spent on the care of foster children. Rather, its position is that the State is not paying the amount the State itself treats as costs— that is, the RCL as adjusted each year in accordance with the CNI — and this is what falls short of complying with the CWA.
The State notes that its plan has been approved by DHHS. While also true, the record leaves us unable to say what — if any — significance this has. For instance, the parties indicated at argument that DHHS approves only the structure of California’s plan, and does not audit what the State pays. Beyond this we have been alerted to no action or opinion by DHHS to which we would owe deference. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Skidmore v. Swift & Co., 328 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).
In sum, the CWA does not set rates or tell states how they are supposed to cover costs. It does not require states to apply an index such as the CNI, or to adopt any particular system for arriving at the amount to be reimbursed. But the CWA does direct participating states to make foster care maintenance payments that “cover the cost of’ listed items such as food, clothing, and shelter. Nothing required California to opt in to the CWA program, but once it agreed to take federal dollars, it is “bound to ‘comply with federally imposed conditions.’ ” Missouri Child Care Ass’n v. Cross, 294 F.3d 1034, 1036 (8th Cir.2002) (quoting Pennhurst State Sch. & Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). In our judgment those conditions are clear — the State must pay for the cost of listed items. 42 U.S.C. § 675(4)(A). And to do so, under the system the State chose to follow, it must make yearly CNI adjustments (or some other inflationary adjustment) to account for the rise (or fall) in its standardized schedule of rates.
V
The Alliance and the State dispute whether California is in substantial compliance with the CWA.[6] As a general rule, a state that accepts federal funds with conditions attached must strictly comply with those conditions — substantial compliance will not be good enough. See Withrow v. Concannon, 942 F.2d 1385, 1386-87 (9th Cir.1991) (requiring strict compliance with a requirement in federal regulations of a review hearing within a pre-specified number of days). The CWA plainly attaches the condition that participating states “shall” cover the listed costs. This said, *1023 DHHS regulations indicate that the federal government is willing to accept “substantial compliance” at least in some circumstances. See, e.g., 45 C.F.R. §§ 1355.39, 1356.71(c)(5). And it makes sense that compliance cannot, as a practical matter, invariably be strict. Thus, California’s system necessarily averages costs across each of the fourteen categories by which it classifies group homes, and the CNI is just a proxy for actual increases (or decreases) in cost. Likewise, that the State’s definition of covered items for foster care maintenance payments does not precisely mirror the federal statute does not make it noncompliant. Compare 42 U.S.C. § 675(4)(A), with Cal. Welf. & Inst.Code § 11460(b). The State’s plan generally tracks the federal definition of daily living expenses, making the State substantially compliant. Beyond this, however, we have difficulty seeing how payment of approximately 80 percent of the costs of providing the listed items can qualify as substantial compliance. The federal objective is for those costs to be covered. As 80 percent isn’t even close, and the State makes no serious argument that it is, we hold that its foster care maintenance payments do not substantially comply with the CWA.
VI
Because the State is not covering the costs required by the CWA, we reverse the district court’s order granting summary judgment to the State and denying summary judgment to the Alliance. There are no factual disputes in this case and therefore, the Alliance is entitled to judgment as a matter of law. We remand to the district court to determine the proper scope of declaratory and injunctive relief.
REVERSED and REMANDED.

. California’s Title IV-E State Plan consists of a compilation of California statutes, regulations, All County Letters, All County Information Notices, County Fiscal Letters, and other documents that are intended to implement federal requirements for the federal foster care program in order to claim Federal Financial Participation in payments made under the program.

. See also Cal. Welf. & Inst.Code § 11453(c)(3) (“In any fiscal year commencing with the 2000-01 fiscal year to the 2003-04 fiscal year, inclusive, when there is no increase in tax relief pursuant to the applicable paragraph of subdivision (a) of Section 10754 of the Revenue and Taxation Code, then any increase pursuant to subdivision (a) of this section shall be suspended.”).

. 127 percent divided by 159 percent (the level payments would have been at had the State followed its initial plan to tie adjustments to the CNI) equals 79.8 percent.

. The Alliance subsequently moved for reconsideration under Federal Rules of Civil Procedure 59(e) and 60(b) on the footing that the State’s new proposed budget would result in payments decreasing to 70 percent of the amount group homes would have been entitled to had the State followed the adjustment scheme it originally implemented. The district court denied leave to file the motion because the proposed budget had not yet been passed, making the Alliance’s new claims unripe.

. We note that district courts across the country have split on whether the CWA creates a private right of action. Compare Cal. Alliance of Child & Fam. Servs. v. Allenby, 459 F.Supp.2d 919, 922-25 (N.D.Cal.2006) (finding a private right of action under the CWA); Cal. State Foster Parent Assoc. v. Wagner, No. C 07-05086 WHA, 2008 WL 191283 (N.D.Cal. Jan. 22, 2008) (same); Kenny A. ex rel. Winn v. Perdue, 218 F.R.D. 277, 302-04 (N.D.Ga.2003) (same); Missouri Child Care Ass’n v. Martin, 241 F.Supp.2d 1032, 1037-42 (W.D.Mo.2003) (same), with Carson P. ex rel. Foreman v. Heineman, 240 F.R.D. 456, 539-41 (D.Neb.2007) (finding no private right of action under the CWA); Olivia Y. ex rel. Johnson v. Barbour, 351 F.Supp.2d 543, 564-65 (S.D.Miss.2004) (same). Yet, the state makes no argument on appeal on this point. If the question were jurisdictional, we would nonetheless be required to raise the concern ourselves; but the Supreme Court has stated explicitly that "whether a cause of action exists is not a question of jurisdiction.” Burks v. Lasker, 441 U.S. 471, 476 n. 5, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). Accordingly, our familiar rule that issues not raised in the briefing are deemed waived, see United States v. Loya, 807 F.2d 1483, 1486-87 (9th Cir.1987), is applicable.

. The concept appears to have originated in Missouri Child Care Ass’n, 241 F.Supp.2d 1032, 1046 n. 7 (W.D.Mo.2003) ("While it is true that Missouri need only be in substantial compliance with the [Act], a failure to even consider the relevant statutory factors cannot be substantial compliance.”).