**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA ALLIANCE OF CHILD AND
FAMILY SERVICES,
              *Plaintiff-Appellant,*

       v.

CLIFF ALLENBY, Interim Director of
the California Department of
Social Services, in his official
capacity; MARY AULT, Deputy
Director of the Children and
Family Services Division of the
California Department of Social
Services, in her official capacity,
            *Defendants-Appellees.*

No. 08-16267

D.C. No.
3:06-cv-04095-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted
October 7, 2009—San Francisco, California

Filed December 14, 2009

Before: Alfred T. Goodwin and Pamela Ann Rymer,
Circuit Judges, and George H. Wu,* District Judge.

Opinion by Judge Rymer;
Concurrence by Judge Wu

*The Honorable George H. Wu, United States District Judge for the
Central District of California, sitting by designation.

16421

**COUNSEL**

William F. Abrams, East Palo Alto, California, for the appellant.

George Prince, Deputy Attorney General, San Francisco, California, for the appellees.

**OPINION**

RYMER, Circuit Judge:

California Alliance of Child and Family Services, an association of private, non-profit agencies that provide adoption, foster care, and group home services, appeals the summary judgment entered in favor of Cliff Allenby, the interim director of the California Department of Social Services (the State). We must determine whether the State is in compliance with the federal Child Welfare Act's (CWA) mandate that a participating state "cover the cost" of certain enumerated items for foster care group homes when it pays at a rate that is approximately 80 percent of actual 1986-1987 costs adjusted for inflation. The district court concluded that this substantially complies with the CWA. We disagree; the natural meaning of "cover the cost" is to pay in full, not in part. As the State isn't doing this, we reverse.

I

The CWA, codified at 42 U.S.C. §§ 670-679b, was enacted in 1980 and creates an opt-in scheme whereby states can

receive federal funding to assist in the costs associated with raising children who are dependants or wards of the state. To qualify for federal funding, the state agrees to abide by certain requirements.

The state must first submit a plan to the Secretary of the United States Department of Health and Human Services (DHHS). *See* 42 U.S.C. § 671(a). Among other things, the plan must "provide[ ] for foster care maintenance payments in accordance with" other provisions of the CWA. 42 U.S.C. § 671(a)(1). The state must also designate a state agency to administer the plan once approved, and must agree to amend its plan to comply with any changes made to the CWA or other applicable federal law. 42 U.S.C. § 671(a)(2); 45 C.F.R. § 1356.20(d)(1).

The CWA further provides that any state with an approved plan "shall make foster care maintenance payments on behalf of each" qualifying child. 42 U.S.C. § 672(a)(1). The phrase "foster care maintenance payments" is defined as

> payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence.

42 U.S.C. § 675(4)(A).

California has created its own statutory scheme in an

attempt to comply with the CWA.[1] It has designated the California Department of Social Services (CDSS) as the agency responsible for administering California's CWA plan. *See* Cal. Welf. & Inst. Code §§ 11229, 11460(a). The plan calls for CDSS to pay foster care providers on "a per child per month rate in return for the care and supervision of the [ ] child placed with them." Cal. Welf. & Inst. Code § 11460(a). "Care and supervision" is defined in such a way that it substantially mirrors the federal definition of foster care maintenance payments. It covers "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." Cal. Welf. & Inst. Code § 11460(b).

California uses the Rate Classification Level system (RCL) to determine the amount of the foster care maintenance payments it makes. *See* Cal. Welf. & Inst. Code § 11462. The RCL uses a point system that classifies group homes in fourteen categories—the funding they receive depends on the category. *See* Cal. Welf. & Inst. Code § 11462(b), (d)-(f). A group home's RCL is based on "the level of care and services that the group home operator projects will be provided during the period of time for which the rate is being established," Cal. Welf. & Inst. Code § 11462(e), and payments are made on a per child, per month basis, Cal. Welf. & Inst. Code § 11460(a). The rates were initially made effective on July 1, 1990, relying on data from a study of 1985 calendar year costs and since then reflect adjustments made, starting with the 1986-1987 fiscal year, based on the California Necessities Index (CNI). *See* Cal. Welf. & Inst. Code § 11462(c). The

---

[1]California's Title IV-E State Plan consists of a compilation of California statutes, regulations, All County Letters, All County Information Notices, County Fiscal Letters, and other documents that are intended to implement federal requirements for the federal foster care program in order to claim Federal Financial Participation in payments made under the program.

CNI is a weighted average of changes in various costs of living for low-income consumers, including food, clothing, fuel, utilities, rent and transportation. *See, e.g.*, Cal. Welf. & Inst. Code § 11453(a). Thus, these annual adjustments reflect any increase or decrease in the cost of living, as measured by one constant calculation of inflation—the CNI. *See id.* Beginning with the 2000-2001 fiscal year, the California statute has provided that "the standardized schedule of rates [for group homes] shall be adjusted annually by an amount equal to the CNI computed pursuant to Section 11453, subject to the availability of funds. The resultant amounts shall constitute the new standardized schedule of rates." Cal. Welf. & Inst. Code § 11462(g)(2).[2]

## II

The Alliance accepts the State's system for calculating costs to be covered, but takes issue with the State's underfunding of foster care maintenance payments as a result of having failed to adjust the standardized schedule of rates by an amount equal to the CNI since 2001. Accordingly, it brought this action, asserting that the State is violating CWA's mandate to cover costs, and seeking declaratory and injunctive relief under 42 U.S.C. § 1983.

After discovery, the parties filed cross motions for summary judgment. In a joint statement of undisputed facts they agreed that since the inception of the RCL, the payment schedule has increased by approximately 27 percent; that since the 1990-1991 fiscal year, the actual costs incurred by group homes for the care and supervision of children has

---

[2]*See also* Cal. Welf. & Inst. Code § 11453(c)(3) ("In any fiscal year commencing with the 2000-01 fiscal year to the 2003-04 fiscal year, inclusive, when there is no increase in tax relief pursuant to the applicable paragraph of subdivision (a) of Section 10754 of the Revenue and Taxation Code, then any increase pursuant to subdivision (a) of this section shall be suspended.").

increased by more than 27 percent; and that the CNI has increased by approximately 59 percent since the 1990-1991 fiscal year. The State admits that as of 2005-2006, it was making foster care maintenance payments at an amount approximately 80 percent[3] of what they would have been had it made yearly CNI adjustments.

The district court granted summary judgment in favor of the State. The court concluded that the State based its initial reimbursement standard on the statutory criteria mandated by the federal statute. Although the court recognized that the standard rate schedule could become so out of sync with the cost of items listed in the CWA that the California system would be in violation of federal law, it concluded that the process for determining foster care payment rates remains substantially compliant given that today, the RCL provides for about 80 percent of the costs associated with those items. Finally, the court held that the CWA does not prohibit the State from taking budgetary considerations into account.[4]

## III

"We review the district court's decision to grant summary judgment *de novo*. Thus, viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Fichman v. Media Center*, 512 F.3d 1157, 1159

---

[3]127 percent divided by 159 percent (the level payments would have been at had the State followed its initial plan to tie adjustments to the CNI) equals 79.8 percent.

[4]The Alliance subsequently moved for reconsideration under Federal Rules of Civil Procedure 59(e) and 60(b) on the footing that the State's new proposed budget would result in payments decreasing to 70 percent of the amount group homes would have been entitled to had the State followed the adjustment scheme it originally implemented. The district court denied leave to file the motion because the proposed budget had not yet been passed, making the Alliance's new claims unripe.

(9th Cir. 2008) (internal citation omitted); *see also* Fed. R. Civ. P. 56(c). We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1331.[5]

IV

**[1]** The threshold question in this case is what the CWA actually mandates the State to do. Section 672(a)(1) provides that the State "shall make foster care maintenance payments on behalf of each" qualifying child—that is, "payments to cover the cost of (and the cost of providing)" various daily living expenses, 42 U.S.C. § 675(4)(A). We therefore must answer two questions: (1) What does it mean to "cover" costs? and (2) how are "costs" defined? We address each question in turn.

**[2]** In determining what it means to "cover" costs, we look to the relevant statute for context. "In interpreting a statute, we first look to the plain meaning of its text." *See Paul Revere Insurance Group v. United States*, 500 F.3d 957, 962 (9th Cir. 2007). Absent a definition in the statute itself, in

---

[5]We note that district courts across the country have split on whether the CWA creates a private right of action. *Compare Cal. Alliance of Child & Fam. Servs. v. Allenby*, 459 F.Supp.2d 919, 922-25 (N.D. Cal. 2006) (finding a private right of action under the CWA); *Cal. State Foster Parent Assoc. v. Wagner*, No. C 07-05086 WHA, 2008 WL 191283 (N.D. Cal. Jan. 22, 2008) (same); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 302-04 (N.D. Ga. 2003) (same); *Missouri Child Care Ass'n v. Martin*, 241 F.Supp.2d 1032, 1037-42 (W.D. Mo. 2003) (same), *with Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 539-41 (D. Neb. 2007) (finding no private right of action under the CWA); *Olivia Y. ex rel. Johnson v. Barbour*, 351 F.Supp.2d 543, 564-65 (S.D. Miss. 2004) (same). Yet, the state makes no argument on appeal on this point. If the question were jurisdictional, we would nonetheless be required to raise the concern ourselves; but the Supreme Court has stated explicitly that "whether a cause of action exists is not a question of jurisdiction." *Burks v. Lasker*, 441 U.S. 471, 476 n.5 (1979). Accordingly, our familiar rule that issues not raised in the briefing are deemed waived, *see United States v. Loya*, 807 F.2d 1483, 1486-87 (9th Cir. 1987), is applicable.

attempting to divine the meaning of a particular word we generally use the "ordinary, contemporary, common meaning." *Wilderness Society v. U.S. Fish & Wildlife Service*, 353 F.3d 1051, 1060 (9th Cir. 2003) (en banc) (internal quotation marks omitted); *see United States v. Smith*, 155 F.3d 1051, 1057 (9th Cir. 1998). Here, the term "cover" and the phrase "cover the costs" are both left undefined by the CWA. In these circumstances, consulting common dictionary definitions is the usual course. *See Wilderness Society*, 353 F.3d at 1061.

**[3]** Various dictionaries indicate that to "cover" in the context of costs means an amount sufficient to pay all the costs. *See, e.g.*, Concise Oxford English Dictionary 330 (Catherine Soanes & Angus Stevenson, eds., 11th ed., Oxford Univ. Press 2004) ("(of money) be enough to pay (a cost): there are grants to cover the cost of materials for loft insulation"); Webster's Third New International Dictionary 524 (Merriam-Webster 2002) ("to be adequate to defray or compensate"). This comports with the common understanding of what it means to "cover the cost." For example, we normally understand an obligation to maintain sufficient funds in a bank account to cover checks as requiring us to provide enough money in reserve to offset the amount of the check. Eighty percent of the amount won't do. On the other hand, it is easy to imagine an alternate scenario where "cover" is qualified. For example, parents might tell their child they will *help* cover the cost of college. In such a scenario, the common understanding would be that the parents will cover some, but not all, of their child's college-related expenses. But here, because the CWA leaves "cover" unqualified, the common understanding is that it must refer to meeting all the costs of food, clothing, shelter, etc. *See* 42 U.S.C. § 675(4)(A).

**[4]** The question then becomes one of measuring the cost of those covered items. While the CWA identifies the types of items that must be covered, it does not prescribe any particular metric to measure the cost of those items. Each state

develops its own plan. California uses the RCL system to make this determination. At the time it implemented its CWA plan, the State looked to 1985 calendar year costs from a pilot study for the various items, *see* Cal. Welf. & Inst. Code § 11462(c), and created separate levels for different group homes based on the "care and services that the group home operator projects will be provided during the period of time for which the rate is being established," Cal. Welf. & Inst. Code § 11462(e). The California statute moreover provides for yearly adjustments in the proper RCL calculation, tied to the CNI—in other words, it makes sure if the cost of certain items rise or fall, the RCL takes that change in cost into account. *See* Cal. Welf. & Inst. Code §§ 11453(a), 11462(c). Thus, California decided that the original RCL, as adjusted by the CNI each year, is the cost of the basket of items the CWA requires to be covered. It is undisputed that the State is no longer paying this amount—rather, it is paying somewhere in the neighborhood of 80 percent of the amount. In other words, the CWA requires California to cover the cost of certain items and California has developed a formula to determine what those items cost, but is now only partially covering the cost of those items. This runs afoul of the CWA's mandate.

The State's arguments to the contrary are not persuasive. It points out that the provision for a CNI adjustment in its CWA plan is subject to availability of funds. However, the State disavows relying on this "out" in this case; its brief represents that "California is not using 'lack of funds' as an 'excuse' to avoid complying with the Act." In any event, the State developed no record to support the possibility that it skipped a yearly CNI adjustment for lack of funds. Consequently, we decline both parties' invitation to express an opinion on whether availability of funds is a proper limitation under the CWA on the obligation to cover costs.

The State emphasizes that the CWA does not mandate covering "actual" costs, which is true. However, this is a strawman as the Alliance does not contend that the State must

cover every dime spent on the care of foster children. Rather, its position is that the State is not paying the amount the State itself treats as costs—that is, the RCL as adjusted each year in accordance with the CNI—and this is what falls short of complying with the CWA.

The State notes that its plan has been approved by DHHS. While also true, the record leaves us unable to say what—if any—significance this has. For instance, the parties indicated at argument that DHHS approves only the structure of California's plan, and does not audit what the State pays. Beyond this we have been alerted to no action or opinion by DHHS to which we would owe deference. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

**[5]** In sum, the CWA does not set rates or tell states how they are supposed to cover costs. It does not require states to apply an index such as the CNI, or to adopt any particular system for arriving at the amount to be reimbursed. But the CWA does direct participating states to make foster care maintenance payments that "cover the cost of" listed items such as food, clothing, and shelter. Nothing required California to opt in to the CWA program, but once it agreed to take federal dollars, it is "bound to 'comply with federally imposed conditions.' " *Missouri Child Care Ass'n v. Cross*, 294 F.3d 1034, 1036 (8th Cir. 2002) (*quoting Pennhurst State Sch. & Hospital v. Halderman*, 451 U.S. 1, 17 (1981)). In our judgment those conditions are clear—the State must pay for the cost of listed items. 42 U.S.C. § 675(4)(A). And to do so, under the system the State chose to follow, it must make yearly CNI adjustments (or some other inflationary adjustment) to account for the rise (or fall) in its standardized schedule of rates.

V

**[6]** The Alliance and the State dispute whether California is in substantial compliance with the CWA.[6] As a general rule, a state that accepts federal funds with conditions attached must strictly comply with those conditions—substantial compliance will not be good enough. *See Withrow v. Concannon*, 942 F.2d 1385, 1386-87 (9th Cir. 1991) (requiring strict compliance with a requirement in federal regulations of a review hearing within a pre-specified number of days). The CWA plainly attaches the condition that participating states "shall" cover the listed costs. This said, DHHS regulations indicate that the federal government is willing to accept "substantial compliance" at least in some circumstances. *See, e.g.*, 45 C.F.R. §§ 1355.39, 1356.71(c)(5). And it makes sense that compliance cannot, as a practical matter, invariably be strict. Thus, California's system necessarily averages costs across each of the fourteen categories by which it classifies group homes, and the CNI is just a proxy for actual increases (or decreases) in cost. Likewise, that the State's definition of covered items for foster care maintenance payments does not precisely mirror the federal statute does not make it non-compliant. *Compare* 42 U.S.C. § 675(4)(A), *with* Cal. Welf. & Inst. Code § 11460(b). The State's plan generally tracks the federal definition of daily living expenses, making the State substantially compliant. Beyond this, however, we have difficulty seeing how payment of approximately 80 percent of the costs of providing the listed items can qualify as substantial compliance. The federal objective is for those costs to be covered. As 80 percent isn't even close, and the State makes no serious argument that it is, we hold that its foster care maintenance payments do not substantially comply with the CWA.

---

[6]The concept appears to have originated in *Missouri Child Care Ass'n*, 241 F.Supp.2d 1032, 1046 n.7 (W.D. Mo. 2003) ("While it is true that Missouri need only be in substantial compliance with the [Act], a failure to even consider the relevant statutory factors cannot be substantial compliance.").

VI

**[7]** Because the State is not covering the costs required by
the CWA, we reverse the district court's order granting sum-
mary judgment to the State and denying summary judgment
to the Alliance. There are no factual disputes in this case and
therefore, the Alliance is entitled to judgment as a matter of
law. We remand to the district court to determine the proper
scope of declaratory and injunctive relief.

REVERSED and REMANDED.

WU, District Judge, concurring:

I agree that the district court's grant of summary judgment
should be reversed and remanded but for different reasons
than delineated in the majority's opinion.

Initially, the majority characterizes the Child Welfare Act
("CWA"), 42 U.S.C. §§ 670-79b, as having a "mandate" that
a participating State "cover the cost" of certain enumerated
items for children's foster care homes. *See* 42 U.S.C.
§ 675(4)(A). It then seems to suggest that it is adopting the
"natural meaning" of the term "cover the cost" which is "to
pay in full, not in part." The majority also states that "because
the CWA leaves 'cover' unqualified, the common understand-
ing is that it must refer to meeting *all* the costs of food, cloth-
ing, shelter, etc. [emphasis added]."[1] Later, the majority
indicates that it is acceptable under the CWA for a State to
create a plan which allows for an estimate of the enumerated

[1]Paying "in full" "all" of a foster care provider's costs for supplying
food, clothing, shelter, etc. would be comparable to reimbursing the pro-
vider's actual expenditures for such items. However, that is not what the
majority ultimately concludes is required by the State Plan or what it finds
to be sufficient under the CWA.

costs for various categories of foster care providers (such as the Rate Classification Level or "RCL" herein) and to pay such estimates where the plan also has a provision for annual adjustments (such as the California Necessities Index or "CNI" herein). I agree with the latter conclusion but cannot concur with the initial ones. More importantly, I differ with the majority in regards to the issues which need to be ruled upon in this appeal.

It is not necessary to decide what "cover the cost" means under the CWA or for this court to determine whether "substantial compliance" with the "CWA's cost requirements suffices" in order to resolve this appeal. Further, discretion warrants that we not do so herein. Rather, because the State Plan requires annual CNI adjustments and California clearly has not fully complied with that requirement (or obtained relief from that obligation), reversal can and should be based on that ground alone.

"In order for a State to be eligible for payments under [the CWA]," it must have a plan approved by the Secretary of the Department of Health and Human Services which contains certain prerequisites, one of which is the provision for foster care maintenance payments. *See* 42 U.S.C. § 671(a). The State Plan enacted by California *and* approved by the Secretary requires that "[b]eginning with the 2000-01 fiscal year, the standardized schedule of rates [for the RCL] shall be adjusted annually by an amount equal to the CNI computed pursuant to [Cal. Welf. & Inst. Code] Section 11453, subject to the availability of funds." Cal. Welf. & Inst. Code § 11462(g)(2). On the merits herein, everyone (including the State) seems to accept that: 1) the State Plan enacted by California pursuant to 42 U.S.C. § 671 passes muster; 2) the State Plan requires California to include annual adjustments to the RCL payments (although a lack of funds can affect the increases under section 11462(g)(2)); and 3) California is not in compliance with its Plan in regards to annual adjustments as structured by the State and approved by the Secretary. Nev-

ertheless, at best, all that the Plaintiff has actually shown is that the State has failed to comply with its own statute (*i.e.* Cal. Welf. & Inst. Code § 11462(g)(2)). The State has conceded (and the Plaintiff does not contend otherwise) that California is not using any *un*availability of funds contention to justify its failure to pay the adjusted amounts.

The action before the Court is for violation of the CWA. Without a provision in the CWA for a cost-of-living adjustment or its equivalent, it is difficult to see how the CWA *itself* is violated by the State's conduct. The majority in fact makes the case for this observation when it states (with emphasis added here):

> While the CWA identifies the types of items that must be covered, *it does not prescribe any particular metric to measure the cost of those items*. Each state develops its own plan. California uses the RCL system to make this determination . . . . The California statute moreover provides for yearly adjustments in the proper RCL calculation, tied to the CNI — in other words, it makes sure if the cost of certain items goes up or down, the RCL takes that rise or fall in cost into account . . . . Thus, *California decided* that the original RCL, as adjusted by the CNI each year, is the cost of the basket of items the CWA requires to be covered . . . . In other words, the CWA requires California to cover the cost of certain items and *California has developed a formula* to determine what those items cost, but is now only partially covering the cost of those items.

The opinion later reaffirms this point when it indicates that: "[i]n sum, the CWA does not set rates or tell states how they are supposed to cover costs. It does not require states to apply an index such as the CNI, or to adopt any particular system for arriving at the amount to be reimbursed."

Normally, the difficult issue which would have to be resolved herein is whether the violation of the State's obligations under a cooperative federal-state welfare program could give rise to a federal right enforceable by means of a 42 U.S.C. § 1983 lawsuit.[2] *See generally Blessing v. Freestone*, 520 U.S. 329, 340-48 (1997); *Suter v. Artist M*, 503 U.S. 347, 350-64 (1992). However, in this case, the State in a motion to dismiss specifically raised the issues of "whether the CWA confers a [sic] individual right of enforcement upon plaintiff for foster care maintenance payments" and whether the Plaintiff "has a private right of action under 42 U.S.C. § 1983 to enforce the provisions of the Child Welfare Act at issue." *California Alliance of Child and Family Services v. Allenby*, 459 F.Supp.2d 919, 921-22 (N.D. Cal. 2006). The district court answered "yes" to both of those questions in a published decision. *Id.* However, the State did not file a cross-appeal as to that decision. Moreover, as noted in footnote 5 of the majority's opinion, the State raised no argument on appeal as to whether the CWA creates a private right of action in this context. Thus, the State has effectively (but, perhaps unfortunately, given the importance of those questions and that analysis) waived its right to litigate those issues and has conceded them for purposes of this appeal.

As noted in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 28 (1981), "[i]n legislation enacted pursuant to [Congress's] spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." That is precisely the remedy incorporated into the CWA. Further-

---

[2]A "claim for violation of state law is not cognizable under § 1983." *Cornejo v. County of San Diego*, 504 F.3d 853, 855 n.3 (9th Cir. 2007). "To state a claim for relief in an action brought under § 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

more, the procedure set out in the statute requires the Secretary to initially consider the question of compliance and only thereafter provides for judicial review.

42 U.S.C. § 1320a-2a(a) and (c) state:

**(a) In general**

The Secretary, in consultation with the State agencies administering the State programs under parts B and E of subchapter IV of this chapter, shall promulgate regulations for the review of such programs to determine whether such programs are in substantial conformity with —

(1) State plan requirements under such parts B and E,

(2) implementing regulations promulgated by the Secretary, and

(3) the relevant approved State plans.

\* \* \* \* \*

**(c) Provisions for administrative and judicial review**

The regulations referred to in subsection (a) of this section shall —

(1) require the Secretary, not later than 10 days after a final determination that a program of the State is not in conformity, to notify the State of —

(A) the basis for the determination; and

(B) the amount of the Federal matching funds (if any) to be withheld from the State;

(2) afford the State an opportunity to appeal the determination to the Departmental Appeals Board within 60 days after receipt of the notice described in paragraph (1) (or, if later, after failure to continue or to complete a corrective action plan); and

(3) afford the State an opportunity to obtain judicial review of an adverse decision of the Board, within 60 days after the State receives notice of the decision of the Board, by appeal to the district court of the United States for the judicial district in which the principal or headquarters office of the agency responsible for administering the program is located.

Pursuant to Section 1320a-2a(a) and (c), the Secretary has promulgated consistent regulations. *See*, *e.g.*, 45 C.F.R. §§ 1355.32, 1355.39. A full or partial review can be initiated "at any time, based on any information, regardless of the source that indicates that the State may no longer be operating in substantial conformity." 45 C.F.R. § 1355.32(c)(1).

Given the statutory scheme whereby the issue of substantial conformity of California's foster care program with the CWA (42 U.S.C. Chapter 7, Subchapter IV, Part E) and the approved State Plan is to be first considered by the Secretary's designee and then by the Departmental Appeals Board before review by the district court, we should be somewhat reluctant to reach issues such as the meaning of the term "cover the costs" and whether (and to what extent) "substantial compliance" can satisfy the requirements of 42 U.S.C. § 675(4)(A) before the Secretary has been given the opportunity to initially rule on California's conformity/compliance. The mere fact that the parties have chosen to litigate this case so as to preclude that appropriate review by the Secretary does not mean that this court should unnecessarily decide issues which are within the Secretary's expertise.

In sum, it is apparently undisputed that California is not complying with the requirements of the State Plan approved

by the Secretary because it has failed and is currently failing to provide the full annual adjustments in the form of CNI increases to the RCLs for group foster care maintenance providers as required by Cal. Welf. & Inst. Code § 11462(g)(2). Given that misfeasance/nonfeasance, it is unnecessary to resolve what "cover the cost" in 42 U.S.C. § 675(4)(A) means since, irrespective of any definition which we give it, in the end California is still non-compliant with its own State Plan and California has not sought to raise on this appeal whether the Plaintiff can bring a private action under section 1983 to enforce the provisions of the CWA purportedly at issue herein. Similarly, given that the applicable statute (42 U.S.C. § 1320a-2a) and its concomitant regulations provide that the Secretary is to initially determine whether a State's program is in "substantial conformity" with the requirements of the CWA, its regulations and the relevant approved State Plan, the issue of whether California's practice (of providing only about 80% of the full annual adjusted payments to foster care providers) is in "substantial compliance" with the CWA should be addressed by the Secretary before this court interjects itself into the fray.

In light of the above, I agree that the district court's grant of summary judgment in favor of the State should be reversed and remanded, but for different reasons and on a much more limited basis than pronounced in the majority's opinion.